UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

Eastern Division

| | |
|---|---|
| KAARINA KVAAVIK<br>    Plaintiff<br><br>v.<br><br>VISTATEC, INC., ET AL.<br>    Defendants | CIVIL ACTION NO. 04CV12128PBS |

## ANSWER OF THE DEFENDANT, MERVYN DYKE, TO THE PLAINTIFF'S COMPLAINT

Now comes the defendant, Mervyn Dyke, and answers plaintiff's complaint as follows:

1.      Upon information and belief, admitted.

2.      No response is required to the allegations of paragraph 2 of the complaint because they are directed to another defendant. To the extent an answer is required, upon information and belief, admitted.

3.      No response is required to the allegations of paragraph 3 of the complaint because they are directed to another defendant. To the extent an answer is required, admitted.

4.      Admitted.

5.      Paragraph 5 of the complaint states a conclusion of law to which no response is required. To the extent a response is required, denied.

6.      No response is required to the allegations of paragraph 6 of the complaint because they are directed to another defendant. To the extent a response is required, denied.

2

7.      No response is required to the allegations of paragraph 7 of the complaint because they are directed to another defendant. To the extent an answer is required, denied.

8.      Defendant admits that, as president of VistaTEC, Inc., he had ultimate managerial control over plaintiff and that, during the time period relevant to the complaint, he made personal visits to Massachusetts, and on some occasions, solicited business in Massachusetts. The allegations regarding "personal jurisdiction" state a conclusion of law to which no response is required. Defendant denies the remaining allegations of paragraph 8

9.      Upon information and belief, defendant admits that plaintiff was employed by VistaTEC, Inc., as a business development manager for New England pursuant to contract, the first of which was entered into in February, 2000. Defendant denies the remaining allegations of paragraph 9.

10.     Upon information and belief, admitted.

11.     Defendant admits the allegations of the second, third and fourth sentences of paragraph 11. The first sentence of paragraph 11 states a conclusion of law to which no response is required. To the extent a response is required, denied.

12.     Admitted. Further answering, defendant states that a consensual sexual relationship between himself and plaintiff existed prior to plaintiff's employment by VistaTEC, Inc. and continued on and off throughout her employment.

13.     Defendant admits that, in the course of their four-year relationship, he and the plaintiff had a number of lover's quarrels in which each party expressed anger to the other. Defendant denies the remaining allegations of paragraph 13.

3

14.    Defendant is without sufficient knowledge or information to admit or deny the allegations of paragraph 14.  Further answering, Defendant states that VistaTec, Ltd. has a sexual harassment policy contained in its handbook and that Plaintiff, during the course of her employment, worked on policies in the handbook.

15.    Defendant is without sufficient knowledge or information to admit or deny the allegations of paragraph 15.

16.    Denied.

17.    Defendant admits that, in December, 2003, plaintiff was in Dublin, Ireland for business meetings and the company Christmas party.  Defendant denies the remaining allegations of paragraph 17 of the complaint.

18.    Defendant is without sufficient knowledge or information to admit or deny the allegations concerning plaintiff's state of mind or her conversations with others concerning her state of mind.  Defendant denies the remaining allegations of paragraph 18.

19.    Admitted.

## COUNT I
### SEXUAL HARASSMENT - Mass. Gen. L. c. 214 § 1C
### (VistaTEC, Inc., VistaTEC, Ltd., and Mervyn Dyke, Individually)

20.    Defendant realleges and incorporates by reference his answer to paragraphs 1 through 19 above.

21.    Paragraph 21 states conclusions of law to which no response is required.  To the extent a response is required, denied.

4

22.    No response is required to the allegations of paragraph 22 of the complaint

because they are directed to another defendant.  To the extent an answer is required, denied.

23.    Denied.

## COUNT II
### Assault & Battery
### (Mervyn Dyke, Individually)

24.    Defendant realleges and incorporates by reference his answer to paragraphs 1

through 23 above.

25.    Defendant is without sufficient knowledge or information to admit or deny the

allegations concerning plaintiff's state of mind.  Defendant denies the remaining allegations of

paragraph 25.

26.    Denied.

27.    Denied.

## COUNT III
### Intentional Inflection of Emotional Distress
### (Mervyn Dyke, Individually)

28.    Defendant realleges and incorporates by reference his answer to paragraphs 1

through 27 above.

29.    Denied.

30.    Denied.

31.    Denied.

5

## FIRST AFFIRMATIVE DEFENSE

Counts I, II and III each fail to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

Count II is preempted by Mass. Gen. L. c. 152, § 1 et seq., the worker's compensation statute.

## THIRD AFFIRMATIVE DEFENSE

Count III of the complaint is preempted by Mass. Gen. L. c. 152, § 1 et seq., the worker's compensation statute.

## FOURTH AFFIRMATIVE DEFENSE

Defendant is not an "employer" within the meaning of Mass. Gen. L. c. 151B, § 4(16A).

## FIFTH AFFIRMATIVE DEFENSE

Plaintiff is barred from recovering upon any equitable claims because she comes before this Court with unclean hands.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the doctrines of waiver and estoppel.

## SEVENTH AFFIRMATIVE DEFENSE

This Court has no jurisdiction over plaintiff's claims to the extent that the events transpired in a foreign jurisdiction, to wit Ireland.

WHEREFORE, defendant requests that this Court enter judgment in his favor on plaintiff's claims, dismiss said claims and award him his costs.

6

## COUNTERCLAIMS

1.      In or around March, 1999, plaintiff-in-counterclaim, Mervyn Dyke ("Mr. Dyke") and defendant-in-counterclaim, Kaarina Kvaavik ("Ms. Kvaavik") began an intimate sexual relationship.

2.      Ms. Kvaavik informed Mr. Dyke that she was unable to become pregnant. Ms. Kvaavik knew that Mr. Dyke did not want her to become pregnant.

3.      Ms. Kvaavik intended for Mr. Dyke to rely upon her representation concerning her inability to bear a child, and he did, in fact, rely upon the same.

4.      The representation that Ms. Kvaavik was unable to bear a child was false.

5.      In or around June of 2002, Ms. Kvaavik informed Mr. Dyke that she believed that she was pregnant. Ms. Kvaavik informed Mr. Dyke that she had no doubt that he was the father. Mr. Dyke repeatedly questioned Ms. Kvaavik concerning her assertion that he was the father of the child she was carrying. On each occasion, Ms. Kvaavik reaffirmed that she was certain that Mr. Dyke was the father.

6.      From the commencement of their relationship, Mr. Dyke and Ms. Kvaavik promised each other that, during the course of their relationship with each other, they would not engage in sexual relations with others. On a number of occasions during their relationship, Mr. Dyke asked Ms. Kvaavik if she was remaining monogamous in her relationship with him. On each occasion, Ms. Kvaavik assured Mr. Dyke that she was not having sexual relations with anyone but him. She made this representation to Mr. Dyke before she became pregnant, during her pregnancy, and thereafter. Ms. Kvaavik's representations were untrue.

7.     Ms. Kvaavik shared intimate details of her pregnancy and the labor and delivery process with Mr. Dyke. Ms. Kvaavik and Mr. Dyke together chose the name for the child, S.

8.     S. was born in February, 2003.

9.     From February, 2003 until January, 2004, Ms. Kvaavik regularly sent to Mr. Dyke pictures of S. and shared with him numerous intimate details regarding the child's development.

10.     Ms. Kvaavik's actions were designed to, and did, in fact, cause Mr. Dyke to become emotionally attached to the child he had been led to believe was his daughter.

11.     From February, 2003 to December 12, 2003, Mr. Dyke visited with S. and Ms. Kvaavik on a number of occasions. When Ms. Kvaavik traveled to Ireland, Mr. Dyke spent time with S. On occasion, he arranged child care for S. when she and Ms. Kvaavik were in Ireland. When Mr. Dyke traveled to the United States, he would stay with Ms. Kvaavik, and S., in Ms. Kvaavik's home. On these occasions, he further developed his relationship with S., including being involved with her daily care.

12.     On a number of occasions, Mr. Dyke provided monetary gifts to S. On September 16, 2003, Ms. Kvaavik provided Mr. Dyke with information regarding a bank account she had opened to provide for S.'s support and care.

13.     Mr. Dyke visited with S., and with Ms. Kvaavik, at her rented flat in Dublin, Ireland on several occasions during the week of December 8, 2003. He last saw S. on December 11, 2003. On that occasion he assisted Ms. Kvaavik in giving S. a bath and in putting the child to bed.

14.     Beginning on December 12, 2003 and continuing through July, 2004, when he first learned he was not S.'s father, Ms. Kvaavik took steps to deprive Mr. Dyke of any contact with S.

15.     Upon information and belief, Ms. Kvaavik had sexual relations with Richard Jacobs in and around May of 2002. Mr. Jacobs is a member of senior management of a company called Sophos. During the course of her employment at VistaTEC, Inc., Ms. Kvaavik assisted in marketing ventures directed to Mr. Jacobs.

16.     Upon information and belief, during the pendency of her relationship with Mr. Dyke, Ms. Kvaavik engaged in sexual relations with more than one other individual besides Mr. Dyke and S.'s father, Richard Jacobs.

17.     In or around May 4 and 5, 2004, Ms. Kvaavik, S. and Richard Jacobs participated in genetic testing to determine the identity of S.'s father. In or around May 18, 2004, Ms. Kvaavik received the results of genetic marker testing confirming that Mr. Jacobs was the father of S. She did not inform Mr. Dyke at the time.

18.     During the spring of 2004, Ms. Kvaavik, through counsel, was engaging in discussions with counsel for VistaTEC, Inc. and VistaTEC, Ltd., concerning the circumstances of her separation from employment. These discussions continued into May, 2004.

19.     Upon information and belief, Ms. Kvaavik believed that Mr. Jacobs was, in fact, the father of S. for a period of time before May 4, 2004.

20.     In the late winter, early spring of 2004, Mr. Dyke was greatly despondent concerning his inability to see S. In or around March, 2004, Mr. Dyke first contacted counsel in

Massachusetts to explore obtaining visitation rights to enable him to see S. Thereafter, in May, 2004, he authorized his counsel to proceed and, in June, traveled to Massachusetts to pursue legal action.

21.    On June 14, 2004, Mr. Dyke commenced paternity proceedings in the Probate Court for the County of Essex, Massachusetts. A hearing in this matter was scheduled for July 9, 2004. On July 7, 2004, counsel for Ms. Kvaavik sent correspondence to Mr. Dyke's counsel, by facsimile transmission notifying him that he was not S.'s father.

## COUNT I—INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

22.    Plaintiff in Counter Claim realleges and incorporates by reference paragraphs 1 through 22 above.

23.    Ms. Kvaavik's actions, in falsely representing to Mr. Dyke that she had not engaged in sexual relations with other men during the pendency of their relationship, in general, and in the time period in and around May 2002, in particular, caused him to suffer severe emotional distress.

24.    Ms. Kvaavik's actions, in falsely representing to Mr. Dyke that she had no doubt that he was the father of her child S., caused him to suffer severe emotional distress.

25.    Ms. Kvaavik's actions, in failing to inform Mr. Dyke that he was not S.'s father, caused him to suffer severe emotional distress.

26.    The manner and means by which the results of the genetic testing in May of 2004 were conveyed to Mr. Dyke caused him to suffer severe emotional distress.

27.     Mr. Dyke suffered physical symptoms as a result of the emotional distress caused by Ms. Kvaavik's actions including, but not limited to, tremors, loss of sleep, loss of appetite, loss of weight, cardiac-related symptoms and hospitalization for same.

28.     Ms. Kvaavik's actions caused Mr. Dyke to expend considerable sums of money to hire counsel, travel to the United States and commence legal proceedings to establish visitation rights with S. and to undertake independent testing to determine paternity.

29.     Ms. Kvaavik's actions were intentional or reckless.

## COUNT II—NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

30.     Plaintiff in Counter Claim realleges and incorporates by reference paragraphs 1 through 27 above.

31.     Ms. Kvaavik was negligent in representing to Mr. Dyke that she had not engaged in sexual relations with other men, in general, and in and around May 2002, in particular, and caused him to suffer severe emotional distress with physical manifestations.

32.     Ms. Kvaavik was negligent in failing to notify Mr. Dyke that he was not the father of her child, S., and caused him to suffer severe emotional distress with physical manifestations.

33.     Ms. Kvaavik was negligent in not notifying Mr. Dyke that genetic testing in May 2004, proved that he was not the father of her child, S., and caused him to suffer severe emotional distress with physical manifestations.

## COUNT III—FRAUD AND DECEIT

34.     Plaintiff in Counter Claim realleges and incorporates by reference paragraphs 1 through 33 above.

35.    Ms. Kvaavik's statements that:

a) she was unable to bear a child;

b) that she had not engaged in sexual relations with other men during her

relationship with Mr. Dyke; and

c) that Mr. Dyke was the father of her child, S.

were each false.

36.    Ms. Kvaavik knew the statements to be false.

37.    Ms. Kvaavik intended for Mr. Dyke to rely upon her statements.   Mr. Dyke

reasonably relied to his detriment on the statements.

38.    Ms. Kvaavik was reckless in failing to ascertain the truth of her statements when

made.

39.    Mr. Dyke suffered pecuniary losses as a result, including, but not limited to, sums

expended to see S., sums expended for her care, and sums expended to pursue an action to

establish visitation and independent testing to determine paternity.

WHEREFORE, plaintiff in counterclaim respectfully requests that the Court enter

judgment in his favor on all counts of his counterclaim in an amount to be determined at trial,

and all costs, fees and other expenses of the case.

12

## JURY CLAIM

Mr. Dyke demands a trial by jury to the fullest extent permitted by law.


By his Attorneys,


Jean A. Musiker, BBO No. 365410
Sugarman, Rogers, Barshak & Cohen, P.C.
101 Merrimac Street, 9th Floor
Boston, MA 02114-4737
Tel. (617) 227-3030

Dated:  December 10, 2004


## CERTIFICATE OF SERVICE

I, Jean A. Musiker, hereby certify that on the above date I served the within document by mailing a copy of same, first-class mail, postage prepaid to:

Nina Joan Kimball, Esquire
Kimball, Brousseau & Michon, LLP
One Washington Mall, 14th Floor
Boston, MA 02108

Bridnetta D. Edwards, Esquire
Reed Smith, LLP
East Tower, Suite 1100
1301 K Street, N.W.
Washington, DC 20005-3317


Jean A. Musiker

JAM/gv-357140